******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JODY GRISWOLD
(AC 35743)

DiPentima, C. J., and Prescott and Flynn, Js.

*Argued February 17—officially released October 20, 2015*

(Appeal from Superior Court, judicial district of Hartford, geographical area number twelve, Fuger, J.)

*Alice Osedach*, assistant public defender, with whom was *Alexander Ahrens*, certified legal intern, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Anthony J. Spinella*, assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. A jury found the defendant, Jody Griswold, guilty of two counts of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A) and two counts of risk of injury to a child in violation of General Statutes § 53-21. During his trial and over his objection, the trial court admitted video recordings of forensic interviews of the two victims,[1] as well as written summaries of the interviews, under the tender years and medical diagnosis and treatment exceptions to the hearsay rule. The defendant now appeals from the judgment of conviction, claiming that (1) the court improperly admitted the videos and summaries in violation of the standard set forth in *State* v. *Maguire*, 310 Conn. 535, 78 A.3d 828 (2013), a decision released by our Supreme Court after the defendant's trial, and (2) prosecutorial impropriety deprived him of his right to a fair trial.

We agree with the defendant that, pursuant to the stringent standard explicated in *Maguire*, the court improperly admitted the videos of the forensic interviews and their attendant written summaries under the tender years exception to the hearsay rule. Nevertheless, we conclude that the court properly admitted the videos and summaries under the medical diagnosis and treatment exception. We further conclude that prosecutorial impropriety did not deprive the defendant of his right to a fair trial. Accordingly, we affirm the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of this appeal. The defendant was arrested after the victims, J, age eight, and her sister, A, age ten, accused him of touching them inappropriately at a pool party hosted by their mother, a childhood friend of the defendant. The victims alleged that the defendant exposed his penis to J, touched her vagina over her bathing suit, and touched A's chest over her bra but under her clothing while alone with the victims in A's bedroom. They further reported that the defendant committed similar acts during a camping trip when he rubbed J's chest under her clothes and exposed himself to A.

Shortly after reporting the defendant's conduct to their mother, A and J underwent forensic interviews by members of a multidisciplinary investigative team (MIT)[2] at the Greater Hartford Children's Advocacy Center (advocacy center) at Saint Francis Hospital and Medical Center in Hartford. Lisa S. Murphy-Cipolla, the clinical child interview supervisor at the advocacy center, interviewed A. Erin Byrne, a clinical child interview specialist, interviewed J. Both victims repeated their allegations against the defendant during their respective interviews. In accord with the advocacy center's standard practice, the interviews were video recorded, and

DVD copies were provided to the state.

The defendant subsequently moved in limine to preclude the state from introducing A's and J's forensic interview videos during trial, arguing that they constituted inadmissible hearsay and were unfairly prejudicial to him. The state responded that the videos were admissible under two exceptions to the hearsay rule: the tender years exception, codified in § 8-10 of the Connecticut Code of Evidence, and the medical diagnosis and treatment exception, codified in § 8-3 (5) of the Connecticut Code of Evidence. In accordance with the provisions of § 8-10 of the Connecticut Code of Evidence, the trial court, *Fuger*, *J.*, held a hearing outside the presence of the jury to determine the videos' admissibility.

At the hearing, both Murphy-Cipolla and Byrne testified with respect to the interview process at the advocacy center. Murphy-Cipolla testified substantially to the following: the advocacy center conducts interviews of children alleging abuse to "elicit clear and accurate information, minimize any additional trauma, and make recommendations for a medical exam and/or mental health treatment." The advocacy center tapes interviews for two primary reasons: first, so that the children "don't have to talk over and over and over again," and second, to provide a reference for the interviewers when they create their reports. Although Murphy-Cipolla is not employed by any police department, she meets with law enforcement officers and employees of the Department of Children and Families (department) before each interview. Law enforcement officers and department employees then observe the interview as it takes place through a one-way mirror. In this case, a detective from the East Hartford Police Department and an investigative social worker from the department observed A's interview. At the interview's conclusion, Murphy-Cipolla confers with the investigators again to "make sure that [they] hear the same things" and to solicit additional questions from them. Consistent with this practice, Murphy-Cipolla consulted with the detective and social worker observing A's interview, although she could not recall the content of their discussion. At the conclusion of each interview, the child is offered a physical examination and receives a recommendation for mental health evaluation. Following A's interview, Murphy-Cipolla recommended that she receive counseling and a medical evaluation.

Byrne testified that interviews are conducted "[t]o gather information for medical purposes," a point she emphasized repeatedly throughout her testimony. She stated that the primary purpose of videotaping interviews is "to reduce trauma so that the children don't have to be reinterviewed" and "so that the video can serve as the child's statement." Byrne further elaborated that "part of the reason why [the advocacy center]

videotape[s] the interview is so that it would serve as a child's . . . statement in the event that something . . . may go to a next level." She explained that law enforcement officials and department investigators observe interviews through a one-way mirror "to reduce the trauma to the child so they don't have to be reinterviewed by anyone else." Like Murphy-Cipolla, Byrne also testified that at each interview's conclusion, she consults with the law enforcement officials and department investigators who observed the interview to determine whether they "have anything else that [they] think that [she] should ask," a practice she adhered to during her interview with J. During cross-examination by defense counsel, Byrne recalled asking only one question about J's physical health, specifically, "if she had any worries about her body." She additionally admitted that these questions are typically asked at the end of each interview. Murphy-Cipolla recalled recommending that J receive counseling and that J had received a medical examination at the advocacy center following her interview. Finally, Murphy-Cipolla confirmed that law enforcement and department investigators receive video copies of interviews for use in their investigations.

At the conclusion of the hearing, the court denied the defendant's motion in limine, concluding that both the tender years exception and the medical diagnosis and treatment exception to the hearsay rule were applicable. In announcing its ruling, the court specifically found that the statements in the videos were made shortly after the alleged incident, that they contained guarantees of trustworthiness based on the testimony of Murphy-Cipolla and Byrne, and that the videos were not made in preparation for a legal proceeding.

Pursuant to the court's ruling, and after A and J testified at trial, the state played portions of the forensic interview videos for the jury.[3] Additionally, the court admitted, over the defendant's objection, written interview summaries created by Murphy-Cipolla and Byrne following their interviews of the victims. The jury subsequently found the defendant guilty of two counts of sexual assault in the fourth degree and two counts of risk of injury to a child. The court rendered judgment in accordance with the jury's verdict and imposed a total effective sentence of forty years incarceration, execution suspended after twenty years, and ten years probation. This appeal followed. Additional facts shall be set forth as needed.

The defendant raises two claims on appeal. First, he claims that the court improperly admitted videos of the victims' forensic interviews and the interview summaries. Second, he claims that the prosecutor made several improper statements to the jury during the state's rebuttal argument and thereby deprived him of his right to a fair trial. For the following reasons, we reject both of these claims.

## I

## ADMISSION OF FORENSIC INTERVIEW
## VIDEOS AND SUMMARIES

The defendant first claims that the court improperly admitted the videos of the victims' forensic interviews, as well as the interview summaries generated by Murphy-Cipolla and Byrne, under the tender years and medical diagnosis and treatment exceptions to the hearsay rule.[4] More specifically, he claims that, pursuant to the objective standard described in *State* v. *Maguire*, supra, 310 Conn. 535, the videos and summaries contain testimonial hearsay and, therefore, fall outside both of the hearsay exceptions relied upon by the state. The state argues in response that the videos and accompanying summaries do not contain testimonial hearsay because the essential purpose of the interviews was to provide the victims with medical treatment. Alternatively, the state contends that any error in admitting the videos or summaries was harmless. We agree with the defendant that the court improperly admitted the videos of the victims' forensic interviews, as well as the interview summaries, under the tender years exception of the hearsay rule. We disagree with the defendant, however, that the court improperly admitted the videos and summaries under the medical diagnosis and treatment exception.

We begin our analysis of the defendant's claim by setting forth the standard of review and relevant legal principles. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . In other words, only after a trial court has made the legal determination that a particular statement is or is not hearsay, or is subject to a hearsay exception, is it vested with the discretion to admit or to bar the evidence based upon relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought." (Citation omitted; internal quotation marks omitted.) *State* v. *Miguel C.*, 305 Conn. 562, 571–72, 46 A.3d 126 (2012).

With respect to the merits of the defendant's claim, "[i]t is well settled that . . . [a]n out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies." (Internal quotation marks omitted.) *State* v. *Carrion*, 313 Conn. 823, 837, 100 A.3d 361 (2014). Section 8-10 of the Connecticut Code of Evidence,[5] known as the tender years excep-

tion, excepts from the hearsay rule a "statement by a child under thirteen years of age relating to a sexual offense committed against that child, or an offense involving physical abuse committed against that child by a person or persons who had authority or apparent authority over the child," provided, inter alia, "the statement was not made in preparation for a legal proceeding . . . ." Similarly, § 8-3 (5) of the Connecticut Code of Evidence[6] provides that statements made for the purpose of obtaining a medical diagnosis or treatment are not precluded from admission by the hearsay rule. We address the applicability of each of these exceptions in turn.[7]

A

Tender Years Exception

Our Supreme Court has previously recognized that the tender years exception to the hearsay rule must be applied "consistently with the sixth amendment bar against testimonial hearsay, as explained in *Crawford* [v. *Washington*, 541 U.S. 36, 68–69, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)]."[8] *State* v. *Maguire*, supra, 310 Conn. 564–65. As the court explained, the "[t]he prohibition of the tender years exception against statements made in preparation of a legal proceeding is simply another way of saying that, to be admissible, the statement must be nontestimonial for purposes of *Crawford*." Id., 565. Thus, "the standard of admissibility under *Crawford* is the same as the standard to be applied under the tender years exception." Id. The requirement for admission under this exception that the statement be nontestimonial applies even in cases that do not raise a confrontation clause issue.

The task of determining whether a statement is testimonial has not always been straightforward, due in large part to the continually evolving nature of the United States Supreme Court's *Crawford* jurisprudence. At the time that the trial court in the present case considered the issue, the leading Connecticut case addressing the admissibility of statements made during forensic interviews was *State* v. *Arroyo*, 284 Conn. 597, 935 A.2d 975 (2007). In that case, our Supreme Court determined that statements made during the course of a forensic interview of a minor victim of a sexual assault were nontestimonial and, therefore, not barred by the confrontation clause of the sixth amendment. Id., 616. Because *Arroyo* served as highly pertinent authority at the time of the trial court's ruling on the defendant's motion in limine in the present case, we discuss it, as well as subsequent cases implicating the court's analysis in *Arroyo*, in detail here.

The five year old victim in *Arroyo* was examined at Yale-New Haven Hospital after complaining to her mother about irritation in her vaginal area, as well as various other symptoms. Id., 602. The hospital initially

diagnosed her with a urinary tract infection and prescribed antibiotics; id.; but her symptoms persisted and she subsequently returned for further treatment. Id., 602–603. Following testing, medical personnel determined the cause of the victim's symptoms to be chlamydia. Id., 603. Despite additional antibiotics, the victim's symptoms continued for approximately five more months. Id.

During this time, various hospital personnel, social workers, the victim's kindergarten teacher, and an investigator for the department interviewed the victim. Id. After the victim tested positive for chlamydia a second time, the department investigator took the victim to the Yale Sexual Abuse Clinic (clinic) at Yale-New Haven Hospital, where she was interviewed on three occasions by a forensic interviewer. Id., 603–606. At least two of these interviews were recorded using a recording device provided by the police, and a member of law enforcement observed the interviews through a one-way mirror as they occurred. Id., 626. During the third interview, the victim described several instances in which the defendant had sexually assaulted her. Id., 605–606. The state subsequently charged the defendant with, inter alia, sexual assault in the first degree and risk of injury to a child. Id., 607.

At the defendant's trial, the court admitted the statements made by the victim during her forensic interviews. Id., 625. The jury thereafter found the defendant guilty of, inter alia, sexual assault in the first degree and risk of injury to a child. Id., 600. He appealed from his conviction, arguing that the statements recounted by the clinic interviewer were testimonial hearsay and, thus, barred by *Crawford*.[9] Id., 601.

The court rejected the defendant's *Crawford* claim, and concluded that the statements were not testimonial hearsay. Id., 621. In making this determination, the court in *Arroyo* relied principally on the United States Supreme Court's decision in *Davis* v. *Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), in which that court attempted to clarify the meaning of the term "testimonial" for *Crawford* purposes. *State* v. *Arroyo*, supra, 284 Conn. 626–30. On the basis of its review of *Davis*, the court in *Arroyo* concluded that "the determining factor resolving whether the subject statements are testimonial or nontestimonial is the primary purpose of the interrogation between the declarant and the witness whose testimony the state later seeks to introduce regarding the declarant's statements; that is, whether the interrogation is primarily intended to provide assistance to the declarant or to further investigation and preparation for prosecution." Id., 629. The court further concluded that "[d]eclarants who make statements, even regarding a possible crime, in order to obtain assistance, do not do so with the intent or expectation of assisting the state in building a case

against a defendant, nor do the recipients of such statements act with such intent or expectation. As the [United States Supreme Court] stated in *Davis*, when making statements in order to obtain emergency assistance, '[the victim] simply was not acting as a *witness*; she was not *testifying*. . . . No witness goes into court to proclaim an emergency and seek help.' . . . *Davis* v. *Washington*, supra, [828]. Thus, in focusing on the primary purpose of the communication, *Davis* provides a practical way to resolve what *Crawford* had identified as the crucial issue in determining whether out-of-court statements are testimonial, namely, whether the circumstances would lead an objective witness reasonably to believe that the statements would later be used in a prosecution." *State* v. *Arroyo*, supra, 630.

With these principles in mind, the court in *Arroyo* identified several facts on which it based its conclusion that the victim's statements were nontestimonial. First and foremost, the court noted that the clinic's forensic interviewers were "an integral part of the chain of medical care"; id., 633; because they were, inter alia, paired with a medical care provider, and participated in diagnosing and formulating treatment plans for victims. Id., 632–33. The court also noted that the clinic interviewer in *Arroyo* had specifically testified that the purpose of her interview with the victim was to secure medical and mental health treatment. Id., 635. With respect to the involvement of law enforcement in the interview of the victim, the court observed that this was consistent with the concept of statutory MITs, a purpose of which is to ensure the welfare of child victims. Id., 634–35.

On the basis of these factors, the court "conclude[d] that the primary purpose of the interviews was not to build a case against the defendant, but to provide the victim with assistance in the form of medical and mental health treatment. Therefore, the statements were nontestimonial, and the admission of those statements did not violate the defendant's right to confrontation." Id., 635.

Approximately three years after our Supreme Court decided *Arroyo*, the United States Supreme Court modified the *Crawford* calculus for determining whether a statement is testimonial in *Michigan* v. *Bryant*, 562 U.S. 344, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011). In *Bryant*, the court expanded the "primary purpose" test by shifting the focus of the inquiry from the declarant's actions to those of both the declarant and the interrogator. Specifically, the court instructed that "[i]n determining whether a declarant's statements are testimonial, courts should look to all of the relevant circumstances. . . . [T]he interrogator is relevant to this evaluation . . . . [T]he identity of an interrogator, and the content and tenor of his questions . . . can illuminate the primary purpose of the interrogation." (Citations omitted; internal quotation marks omitted.) Id.,

369. Moreover, the court reaffirmed and emphasized the objective nature of this inquiry. "The statements and actions of the parties must . . . be objectively evaluated. That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." Id., 360.

Following the United States Supreme Court's expansion of the primary purpose test in *Bryant*, our Supreme Court decided *State* v. *Maguire*, supra, 310 Conn. 535, the case on which the defendant in the present case primarily relies. In that case, a jury found the defendant guilty of risk of injury to a child and sexual assault in the fourth degree after the victim accused him of inappropriately touching her inside her underwear. The defendant appealed from his conviction, claiming that the trial court had improperly allowed the forensic interviewer to testify to statements made by the victim during her forensic interview, as well as improperly admitted into evidence the video recording and transcript of the interview, under the tender years exception to the hearsay rule. Id., 538. Although the court reversed the defendant's conviction on a different ground, it clarified the standard described in *Arroyo* for the admission of forensic interview evidence. We discuss the facts of *Maguire*, as well as the court's analysis, in full here.

The defendant in *Maguire* was a friend of the victim's mother, who paid him to watch the victim and serve as a buffer between her and her former husband, the victim's father, on the days that he would come to her home to pick up their children. Id., 541. At some point during this arrangement, the victim reported to her brother that the defendant had touched her inside her underwear. Id., 542. The victim's brother repeated this allegation to their adult cousin who, in turn, reported it to the victim's mother. Id.

The victim's mother contacted a family therapist whom she and the victim's father had been seeing, and scheduled an emergency session. Id. At this session, the victim's parents discussed the victim's allegations with the therapist. Id. In compliance with her responsibilities as a mandated reporter, the therapist reported the allegations to the department. Id. The department subsequently forwarded the allegations to the local police department. Id. The victim's parents later went to the police station to file a formal criminal complaint against the defendant. Id. At the same time, they spoke with Officer Anthony Signore, who took their statement and contacted the Danbury Regional Child Advocacy Center (child advocacy center) to schedule an interview between the victim and an MIT. Id., 542–43.

Donna Meyer, the director of the MIT program at the

child advocacy center, conducted the interview of the victim, which was video recorded for later investigative use, and which Signore and a department caseworker observed from behind two-way tinted glass. Id., 543. In response to Meyer's questions, the victim recounted how the defendant had put his hand inside her pants during one occasion when they were sitting together on the couch in her mother's living room. Id. Following the interview, the defendant was arrested and charged with, inter alia, risk of injury to a child and sexual assault in the fourth degree. Id., 544.

At trial, the court admitted, over the defendant's objection, the video recording and a transcript of the forensic interview of the victim pursuant to the tender years exception. Id. At the trial's conclusion, the jury found the defendant guilty of risk of injury to a child and sexual assault in the fourth degree. Id., 545. The defendant appealed from his conviction, arguing, inter alia, that the trial court had improperly admitted the video recording and transcript of the victim's forensic interview under the tender years exception to the hearsay rule. Id., 538–40. The state responded that the video and transcript of the victim's forensic interview were admissible under the "primary purpose" standard set forth in *Arroyo* because the MIT conducted the interview under protocols similar to those employed in the forensic interview in that case. Id., 563–64.

Although it ultimately reversed the defendant's conviction on the basis of prosecutorial impropriety; id., 540; our Supreme Court considered his evidentiary claim because the issue underlying it had the potential to arise again in a new trial. Id., 563. The court began its analysis by rejecting the premise underlying the state's argument, namely, that the challenged evidence was admissible under the standard set forth in *Arroyo* because the victim's interview was conducted under similar protocols. Id., 564. Specifically, the court clarified that "*Arroyo* did not adopt a blanket rule of admissibility for all forensic interviews conducted under the auspices of an MIT or under similar protocol but, rather, only those interviews that are conducted for the *primary purpose* of providing medical assistance to the victim." (Emphasis added.) Id. The challenged evidence was admissible in *Arroyo*, the court explained, only because under the facts presented, "it [was] clear that the primary purpose of [the forensic] interviews was to provide medical assistance to the victim." (Internal quotation marks omitted.) Id., 566.

Significantly, the court in *Maguire* also restated two prior observations that it had made in *State* v. *Cameron M.*, 307 Conn. 504, 523–24 n.20, 55 A.3d 272 (2012), cert. denied,     U.S.    , 133 S. Ct. 2744, 186 L. Ed. 2d 194 (2013), overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 748 n.14, 91 A.3d 862 (2014), a case decided after *Arroyo*. First, it observed that "*Arroyo*

continues to represent a minority position on [the issue of whether forensic interviews are testimonial under *Crawford*] . . . ." (Internal quotation marks omitted.) *State* v. *Maguire*, supra, 310 Conn. 568. Second, it noted that "subsequent to *Arroyo*, the United States Supreme Court decided *Michigan* v. [*Bryant*, supra, 562 U.S. 344], which . . . shift[ed] [the focus] away from the declarant's intent [and] toward [the intent] of the interrogator [for purposes of the determination of] whether the primary purpose of the statement is testimonial . . . . [*Bryant*] has been predicted to further restrict the admissibility of children's hearsay statements in sexual abuse prosecutions." (Internal quotation marks omitted.) *State* v. *Maguire*, supra, 568–69.[10]

The court concluded its analysis by clarifying that the standard in *Arroyo* is "stringent"; id., 570; and that "a victim's statements during a forensic interview may be deemed nontestimonial only if the essential purpose of the interview is to provide medical assistance to the victim." Id., 569. It expressed skepticism that the state would be capable of meeting this standard during the *Maguire* defendant's new trial, noting that "there is nothing in the present record of this case to suggest that the primary or overriding purpose of Meyer's interview was to provide the victim with assistance in the form of medical or mental health treatment. In fact, the record is devoid of any suggestion that the victim or [her] mother . . . sought or obtained such treatment at any time following the victim's disclosure of abuse. There also is strong evidence that Meyer was acting at the behest of law enforcement personnel during the interview." Id., 570.

The court's analysis in *Maguire* frames our inquiry into the matter presently before us, namely, whether the trial court in the present case properly admitted the video recordings of the victims' forensic interviews and their accompanying summaries under the tender years exception to the hearsay rule during the defendant's trial. We note at the outset that the burden is on the state, as the proponent of the challenged statements, to establish that the tender years exception to the hearsay rule applies. See *New England Savings Bank* v. *Bedford Realty Corp.*, 238 Conn. 745, 753, 680 A.2d 301 (1996). Applying the principles discussed in *Maguire* and cases preceding it to the facts of the present case, we conclude that the circumstances surrounding the victims' forensic interviews objectively demonstrate that their primary purpose was not to provide the victims with medical diagnosis or treatment, but to "[establish] or prov[e] past events potentially relevant to later criminal prosecution." (Internal quotation marks omitted.) *State* v. *Maguire*, supra, 310 Conn. 566. We base this conclusion on three important factors.

First, law enforcement and department investigators played a role in the victims' interviews far exceeding

that of passive observers. They participated in conferences with the forensic interviewers both before and after the interviews, and the interviewers actively solicited questions from them to pose to the victims. Importantly, there is no evidence in the record suggesting that either investigator possessed any medical expertise or training relevant to the task of determining whether the victims required medical diagnosis or treatment. Their participation therefore appears to be, from an objective viewpoint, primarily for the purpose of assisting the interviewers in obtaining evidence to use in prosecuting the defendant.

Second, the advocacy center's practice of video recording interviews bears little relation to the treatment of the victims. As Murphy-Cipolla testified, although medical providers "could" review the video from an interview "if they wanted to," they typically obtain information relevant to their treatment by observing the interview firsthand, or during weekly case reviews. In contrast, both Murphy-Cipolla and Byrne admitted that it is standard practice for law enforcement investigators to receive a copy of the video to use in their investigations. In fact, in response to defense counsel's question to Byrne if she had received training regarding what role her interviews play in the prosecution or investigation of abuse complaints, she acknowledged that "part of the reason why [the advocacy center] videotape[s] the interview is so that it would serve as a child's . . . statement in the event that something . . . may go to a next level."

Third and finally, the structure and content of the interviews objectively indicate that they are not primarily directed toward providing medical diagnosis or treatment to the victims. Murphy-Cipolla and Byrne each testified that the focus of their questions is essentially on eliciting facts pertinent to the victims' allegations: the nature of the contact, the identity of the accuser, and how many times the abuse happened, for example.[11] Questions of a traditionally medical nature, on the other hand, such as those relating to the actual physical or mental condition of the victim, are, as they admitted, typically relegated to the end of the interview. Even then, this inquiry appears to be confined, at least in the present case, to asking the victims if they had any "worries" about their bodies. We further note that due to the substantial involvement of the state in the interview process, a hallmark of the clinician-provider relationship—the confidentiality of any medical information gleaned from the interview—is missing. See *Jarmie* v. *Troncale*, 306 Conn. 578, 607, 50 A.3d 802 (2012) ("[t]he principle of confidentiality lies at the heart of the physician-patient relationship and has been recognized by our legislature").

Moreover, in contrast to *Arroyo*, there is little evidence that either Murphy-Cipolla or Byrne "was an *inte-*

*gral* part of the chain of medical care." (Emphasis added.) *State* v. *Arroyo*, supra, 284 Conn. 633. Although they each testified that they met with medical providers to discuss cases, and that treating clinicians would frequently observe their interviews, their testimony does not suggest that they were individually paired with any of these medical providers, as in *Arroyo*, or that they participated in "the ultimate diagnosis and formulation of a treatment plan for the child." Id.

The state attempts to establish that the primary purpose of the victims' interviews was to provide medical diagnosis or treatment by relying, in significant part, on Murphy-Cipolla's and Byrne's assertions to that effect. As we discussed previously, however, the subjective intentions of the interviewers are not proper considerations in the primary purpose inquiry. See *Michigan* v. *Bryant*, supra, 562 U.S. 360. Instead, we look to discern "the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." Id. As the foregoing discussion indicates, we are not persuaded that reasonable participants conducting the same interviews in the manner as Murphy-Cipolla and Byrne would have done so with the primary purpose of providing medical treatment to the victims. Although it may be true that medical treatment was *one* purpose of the interviews, we agree with the defendant that an objective assessment of the circumstances surrounding the interviews leads to the conclusion that their *primary* purpose was to establish and create a record of past events related to the victims' allegations. For this reason, we conclude that the statements contained in the videos of the forensic interviews and the reports generated therefrom were testimonial as a matter of law, and, therefore, improperly admitted under the tender years exception to the hearsay rule.

B

Medical Diagnosis and Treatment Exception

Having determined that the court improperly admitted the forensic interview videos and summaries under the tender years exception to the hearsay rule, we now turn to the issue of whether the court properly admitted the evidence under the medical diagnosis and treatment exception. In support of his claim that the court improperly admitted the videos and summaries under the exception, the defendant advances the following two part argument. First, he argues that the tender years exception and the medical diagnosis and treatment exception are governed by similar standards because statements admissible under both exceptions are similar in nature. Second, he argues that because the videos and summaries were not admissible under the tender years exception because their primary purpose was not to provide medical assistance, they are likewise inadmissible under the medical diagnosis and treatment

exception. We are not persuaded that the medical diagnosis and treatment exception implicates *Crawford*'s prohibition against testimonial hearsay, as the tender years exception does. For this reason, we reject the first part of the defendant's argument. With respect to the second part of the defendant's argument, we conclude that when the admissibility of the videos and summaries is considered under the traditional standard imposed by the medical diagnosis and treatment exception, the court did not improperly admit them.

We begin our analysis by again clarifying the important point that, because the victims appeared at trial and were subject to cross-examination by the defendant, *Crawford* and its progeny do not apply *directly* to the present case. See *Crawford* v. *Washington*, supra, 541 U.S. 60 n.9 ("when the declarant appears for cross-examination at trial, the [c]onfrontation [c]lause places no constraints at all on the use of his prior testimonial statements"). We focused our discussion in part I of this opinion extensively on *Crawford* only because the text of the tender years exception expressly adopts the *Crawford* standard as one of its criteria for admissibility even if a *Crawford* claim is not available to the defendant because the declarant testified at trial. See *State* v. *Maguire*, supra, 310 Conn. 565 ("[t]he prohibition of the tender years exception against statements made in preparation of a legal proceeding is simply another way of saying that, to be admissible, the statement must be nontestimonial for purposes of *Crawford*"); see also Conn. Code Evid. (2009) § 8-10 (a), commentary (explaining that § 8-10 [a] [2] of the Connecticut Code of Evidence "address[es] the exclusion of testimonial statements prohibited by *Crawford*"). Thus, although we determined that the victims' statements were testimonial in nature, we did not conclude that they were barred by the sixth amendment's confrontation clause, as *Crawford* would have required if the declarants were unavailable to testify at trial and there had been no prior opportunity for cross-examination. Rather, we determined only that the forensic interview videos and written summaries did not satisfy one criterion set forth in the tender years exception for admissibility thereunder.

Because hearsay that does not fall into one exception to the hearsay rule may still be admissible if it falls within another exception; see *Doe* v. *Thames Valley Council for Community Action, Inc.*, 69 Conn. App. 850, 868, 797 A.2d 1146, cert. denied, 261 Conn. 906, 804 A.2d 212 (2002); the question of whether the videos and their written summaries are admissible under the medical diagnosis and treatment exception requires its own analysis independent of the one undertaken pursuant to the tender years exception. Indeed, the Code of Evidence specifically states in the tender years exception that "[n]othing in this section shall be construed to . . . prevent the admission of any statement under

another hearsay exception." Conn. Code Evid. § 8-10 (b) (1).

In conducting this analysis, we observe initially that in contrast to the tender years exception, the medical diagnosis and treatment exception to the hearsay rule contains no language expressly or implicitly importing *Crawford*'s prohibition against testimonial hearsay. The exception provides only that statements "made for purposes of obtaining a medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to the medical diagnosis or treatment," are not excluded by the hearsay rule. Conn. Code Evid. § 8-3 (5). Neither this language, nor any common-law principle that we are aware of, mandates that statements offered under the exception be nontestimonial.[12] Rather, their admissibility turns principally on whether "the declarant was seeking medical diagnosis or treatment, and the statements are reasonably pertinent to achieving those ends." (Internal quotation marks omitted.) *State* v. *Cruz*, 260 Conn. 1, 8, 792 A.2d 823 (2002).

In the context of a forensic interview, this standard is substantially less demanding than the one imposed by *Crawford* and incorporated into the tender years exception. Undoubtedly, statements may be " 'reasonably pertinent' "; id.; to obtaining medical diagnosis or treatment even when that was not the *primary purpose* of the inquiry that prompted them, or the principal motivation behind their expression. See *State* v. *Donald M.*, 113 Conn. App. 63, 71, 966 A.2d 266 (forensic interview statements admissible under medical diagnosis and treatment exception because "the purpose of the interview was, *at least in part*, to determine whether the victim was in need of medical treatment" [emphasis added]), cert. denied, 291 Conn. 910, 969 A.2d 174 (2009). Consequently, we anticipate that in most circumstances, the task of demonstrating that a statement made during a forensic interview satisfies the medical diagnosis and treatment exception will be less onerous than establishing that it is admissible under the tender years exception.

Despite the apparent variation in the burdens imposed by the two hearsay exceptions at issue in this case, the defendant argues that, in the context of a forensic interview, the standard governing the medical diagnosis and treatment exception is similar to the standard that governs the tender years exception. He bases this argument on our Supreme Court's observation in *Maguire* that "statements made in the course of a forensic interview that satisfy the criteria for admission under the tender years exception are similar to statements made to a physician in the course of medical treatment, which are admissible under the medical

treatment and diagnosis exception to the hearsay rule
. . . ." *State* v. *Maguire*, supra, 310 Conn. 569. He con-
tends that this "recognized similarity between the two
exceptions implies that if one is inapplicable the other,
a fortiori, does not apply." (Emphasis omitted.)

Our review of *Maguire* compels us to reject this con-
clusion. The pertinent issue raised in *Maguire*, for pur-
poses of the present case, was whether the trial court
had improperly admitted video evidence and statements
made during forensic interviews under the tender years
exception alone. See *State* v. *Maguire*, supra, 310 Conn.
538. The court did not address whether the videos were
additionally admissible under the medical diagnosis and
treatment exception. To the extent that the court dis-
cussed that exception, it appears to have done so as
a means of emphasizing, by way of comparison, that
statements made during a forensic interview and
offered under the tender years exception must be for
the primary purpose of obtaining medical treatment. In
light of the limited scope of the court's inquiry, we
decline to construe the court's observation as sug-
gesting that, because some statements *admissible*
under both hearsay exceptions are similar in nature,
other statements *inadmissible* under one exception are
necessarily inadmissible under the other. In fact, as
previously discussed, the text of the tender years excep-
tion expressly cautions us against reaching this conclu-
sion. See Conn. Code Evid. § 8-10 (b) (1) ("[n]othing in
this section shall be construed to . . . prevent the
admission of any statement under another hearsay
exception").[13]

Having concluded that the applicability of the medical
diagnosis and treatment exception to the hearsay rule
must be determined on its own merits, we set forth the
relevant legal principles that guide our resolution of this
question. "Out-of-court statements made by a patient to
a [medical provider] may be admitted into evidence if
the declarant was seeking medical diagnosis or treat-
ment, and the statements are reasonably pertinent to
achieving these ends." (Internal quotation marks omit-
ted.) *State* v. *Cecil J.*, 99 Conn. App. 274, 289, 913 A.2d
505 (2007), aff'd, 291 Conn. 813, 970 A.2d 710 (2009).
"The rationale for excluding from the hearsay rule state-
ments made in furtherance of obtaining treatment is
that we presume that such statements are inherently
reliable because the patient has an incentive to tell the
truth in order to obtain a proper medical diagnosis and
treatment. . . . The term medical encompasses psy-
chological as well as somatic illnesses and conditions.
. . . Statements made by a sexual assault complainant
to a social worker may fall within the exception if the
social worker is found to have been acting within the
chain of medical care." (Citations omitted; internal quo-
tation marks omitted.) *State* v. *Donald M.*, supra, 113
Conn. App. 70–71. "Although [t]he medical treatment
exception to the hearsay rule requires that the state-

ments be both pertinent to treatment and motivated by a desire for treatment . . . in cases involving juveniles, [we] have permitted this requirement to be satisfied inferentially." (Citation omitted; internal quotation marks omitted.) *State* v. *Telford*, 108 Conn. App. 435, 441–42, 948 A.2d 350, cert. denied, 289 Conn. 905, 957 A.2d 875 (2008).

In the present case, there was sufficient evidence presented at trial that the victims' statements were reasonably pertinent to obtaining medical diagnosis and treatment to bring them within the scope of the medical diagnosis and treatment exception.[14] Specifically, both Murphy-Cipolla and Byrne testified that the purpose of their questions was to assist them in recommending medical examinations or mental health treatment. To that end, they each normally inquire if the children they interview have any concerns about their bodies. Moreover, although the primary purpose of many of their questions appears to be directed toward assisting law enforcement; see part I A of this opinion; the information they obtain from interviews is nonetheless available and provided to medical providers and mental health practitioners. At the conclusion of each interview, Murphy-Cipolla and Byrne make referrals for medical and mental health treatment, as needed. To reduce trauma to victims of sexual assault, the advocacy center performs physical and mental health examinations on site.

On the basis of the foregoing evidence, we conclude that the victims' statements were reasonably pertinent to obtaining medical diagnosis or treatment, and that Murphy-Cipolla and Byrne sufficiently occupied a position within the chain of medical care, to bring the victims' statements within the scope of the medical diagnosis and treatment exception. We also recognize that because the standard for admission of forensic interview evidence under the medical diagnosis and treatment exception is less stringent than the standard for admission under the tender years exception, the state in future cases may rely solely on the medical diagnosis and treatment exception, thereby effectively rendering *Maguire* a nullity. This potential anomaly, however, is not for this court to address but, instead, is best left for consideration by our Supreme Court, either in its adjudicative function or as overseer of the Code of Evidence. Accordingly, we conclude that the court did not abuse its discretion by admitting the forensic interview videos and written summaries containing those statements under the medical diagnosis and treatment exception to the hearsay rule.

## II

### PROSECUTORIAL IMPROPRIETY

The defendant next claims that the prosecutor deprived him of his due process right to a fair trial by

committing various acts of prosecutorial impropriety during his rebuttal argument to the jury. In particular, the defendant claims that the prosecutor improperly (1) denigrated the defendant and his counsel; (2) expressed his personal opinion; and (3) appealed to the emotions, passions, and prejudices of the jury. The state argues that the prosecutor's comments were not improper. Alternatively, the state contends that even if some of the prosecutor's comments were improper, none of them deprived the defendant of a fair trial. We agree with the state's argument that the prosecutor's comments were not improper.

We begin our review of the defendant's claim by setting forth the applicable standard of review. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . . [If] a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . .

"Because the claimed prosecutorial [improprieties] occurred during closing arguments, we advance the following legal principles. [P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [an impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence [on] jurors. His conduct and language in the

trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks [for] no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. [Although] the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Citations omitted; internal quotation marks omitted.) *State* v. *Ross*, 151 Conn. App. 687, 693–94, 95 A.3d 1208, cert. denied, 314 Conn. 926, 101 A.3d 271 (2014).

In the present case, the defendant failed to object at trial to the remarks that he claims were improper. Nevertheless, our Supreme Court has explained that a "defendant's failure to object at trial to each of the occurrences that he now raises as instances of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his claims. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time. . . . With this maxim in mind, we proceed with our review of the defendant's claim[s]." (Internal quotation marks omitted.) Id., 694–95.

A

### Improper Denigration of Defendant And Defense Counsel

The defendant first claims that the prosecutor improperly denigrated both the defendant and defense counsel. Specifically, he claims that the prosecutor repeatedly characterized the defendant as abnormal, accused defense counsel of violating the law, and suggested that defense counsel was willing to invent theories to bolster the defendant's case. The state responds that the prosecutor's comments were proper responses to defense counsel's closing argument. We agree with the state.

The following additional facts are relevant to this claim. During closing argument, defense counsel suggested that the victims had fabricated their allegations against the defendant to prevent their mother from dating him. In support of this theory, he argued that the victims' allegations were implausible and unsupported

by any physical evidence or independent testimony. Specifically, he stated: "Again, no physical evidence that any of these acts occurred. No independent testimony putting [the defendant] alone in this room with these girls during this party. He had not seen these people for many years. So, he just came to this party like a stranger and somehow was able to get inside the house and go upstairs in each of the girl's rooms, alone with the girls. Really? That's amazing. I think that's amazing. And that should not be believed."

In response during rebuttal argument, the prosecutor stated: "With respect to these girls being in the room alone with the defendant. Well, listen, we know why he was up in the room. You heard the story. Their grandmother left them this desk. Him and his brother helped move this desk up in the room. So, that's how he gets up in the room. And I'll concede that it is strange that the defendant is alone with these young girls by themselves. But consider the source. Okay? We're talking about [the defendant] here, not the average person. We're talking about a guy who's playing around with kids when he has no shirt on, with a bathing suit on, which he claims accidentally could have shown his penis to her—to one of these girls while on a camping trip because a frog jumped into his shorts. I mean, this is . . . the type of guy we're talking about, not the average guy. He's so eager to be around with these kids he sets up this camping trip to go camping with them. He's so eager to always be playing and pi[n]ching their butts because he had a tough childhood and he likes playing with kids. This is not the average guy. This is a guy who's into this type of stuff."

"[A] prosecutor should avoid arguments which are calculated to influence the passions or prejudices of the jury, or which would have the effect of diverting the jury's attention from their duty to decide the case on the evidence. . . . It is no part of a [prosecutor's] duty, and it is not his right, to stigmatize a defendant." (Internal quotation marks omitted.) *State* v. *James R.*, 138 Conn. App. 181, 190, 50 A.3d 936, cert. denied, 307 Conn. 940, 56 A.3d 949 (2012). "[A]n improper appeal to the jurors' emotions can take the form of a personal attack on the defendant's character . . . ." (Internal quotation marks omitted.) *State* v. *Santiago*, 143 Conn. App. 26, 37, 66 A.3d 520 (2013).

The defendant contends that the prosecutor's comments improperly stigmatized him in the eyes of the jury by "brand[ing] [him] as an individual with an abnormal fascination with young children whose protestations of innocence should be dismissed out of hand." We do not agree, however, that this was the intent behind, or the effect of, the prosecutor's remarks. Rather, we view the prosecutor's comments as attempting to mitigate the defendant's characterization of the victims' allegations as implausible and unsupported by evidence. By

emphasizing evidence tending to show that the defendant was eager to spend time with the victims and engage in physical contact with them, the prosecutor was attempting to diminish any initial skepticism that might arise from the victims' description of events, which the prosecutor conceded was "strange . . . ." Moreover, we view the state's characterization of the defendant as "a guy who's into this type of stuff" as an attempt to highlight evidence adduced at trial suggesting that the defendant had orchestrated various situations in order to engage in sexually inappropriate contact with the victims. Accordingly, we conclude that these comments were not an improper attempt to stigmatize the defendant, but instead a direct and proportional response to the defendant's challenge to the plausibility of the victims' allegations.

The defendant further argues that the prosecutor improperly denigrated defense counsel by characterizing part of his argument as "illegal" and suggesting that it was possibly fabricated. The state responds that the prosecutor properly commented on defense counsel's improper reference to facts not properly before the jury. We agree with the state.

"[T]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel." (Internal quotation marks omitted.) *State* v. *Orellana*, 89 Conn. App. 71, 101, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005). During his closing argument, defense counsel stated: "I know from just some research. You know, if you look in some of the books, the psychological books. You know, why are these stories sometimes made up? Why do sometimes children make up these stories? And they give a list of reasons. And one reason I read was to satisfy a need for attention and sympathy. That is one—I guess one reason sometimes you see that type of thing happen, to satisfy a need for attention and sympathy. "

During rebuttal argument, the prosecutor responded: "Now, [defense counsel] read out of some book, apparently, that children make up stories to satisfy the need for attention and sympathy. Okay. So, what he just did is illegal. If he wanted to do that, put that evidence in front of you he had to call an expert witness who says, yeah, I deal with children all the time and they make up stories to X, Y and Z. So, what he said about that, you can't consider that at all because it didn't come out in the trial. For all we know he just made that up."

The defendant contends that these comments were improper because they constituted accusations in open court that defense counsel had engaged in dishonest and criminal conduct. In support of this argument, he cites to our Supreme Court's decision in *State* v. *Payne*, 303 Conn. 538, 34 A.3d 370 (2012). In that case, defense counsel had repeatedly asserted during closing argu-

ment that her client was "honest" and had "told the truth." (Internal quotation marks omitted.) Id., 564. In response, the prosecutor stated during rebuttal argument that "attorneys aren't even ethically allowed to say a particular witness is honest or not." (Emphasis omitted; internal quotation marks omitted.) Id., 565. Our Supreme Court concluded that the prosecutor's comment, "although in response to defense counsel's improper statements bolstering the defendant's credibility, was improper because it impugned defense counsel by characterizing her as unethical. It has been held improper for the prosecutor to impugn the role of defense counsel. . . . In particular, [i]t is improper for a prosecutor to tell a jury, explicitly or implicitly, that defense counsel is employing standard tactics used in all trials, because such an argument relies on facts not in evidence and has no bearing on the issue before the jury, namely, the guilt or innocence of the defendant." (Internal quotation marks omitted.) Id., 566. The defendant claims that the prosecutor's comments in the present case are similar to those held improper in *Payne*.

We conclude that *Payne* is distinguishable from the present case. In *Payne*, the prosecutor specifically characterized defense counsel as *unethical*. That is substantively different from characterizing part of an argument as *illegal*, as the prosecutor did in the present case. The context of the prosecutor's remark strongly suggests that he was attempting to convey that defense counsel had argued facts not in evidence, as opposed to violating a rule governing professional conduct or a provision of our Penal Code. Because not every violation of the Code of Evidence is unethical—indeed, many are inadvertent or the result of a good faith belief in the propriety of the attorney's conduct—we decline to construe the prosecutor's use of the word "illegal" as an attack designed to denigrate defense counsel. Instead, we adhere to the well established principle that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (Internal quotation marks omitted.) *State* v. *Ciullo*, 314 Conn. 28, 48, 100 A.3d 779 (2014).[15]

We further read the prosecutor's comment, "[f]or all we know he just made that up," not as suggesting that defense counsel had fabricated facts, but as emphasizing that his comments about the victims' motives had no basis in the evidentiary record. Significantly, the defendant does not dispute that by recollecting the contents of a psychology book he claimed to have read, but to which no expert had testified, defense counsel was placing evidence before the jury that had not been properly introduced during trial. The fact that defense counsel did not object to the prosecutor's remarks at the time that they were made further suggests that he

perceived them to be fair and invited commentary on the propriety of his closing argument, and not accusations that he had engaged in some criminal act or fabricated evidence.

## B

### Improper Expression of Personal Opinion

The defendant next argues that the prosecutor improperly and repeatedly expressed his personal opinion during rebuttal argument. Specifically, he argues that the prosecutor improperly expressed his opinion that (1) there was "no reason" for the victims to fabricate their allegations against the defendant because they "actually liked [him]"; (2) the victims' testimony was "so reliable"; (3) the physical contact between the defendant and the victims was "not an accident"; (4) the defendant's explanation for the victims' allegations about his conduct on the camping trip was "the most ridiculous story"; (5) the defendant "put the nail in his coffin" by conveying that explanation to the police;[16] and (6) the testimony of several defense witnesses was "useless" and "worthless." The state responds that the prosecutor's comments constituted proper argument that was based on the evidence produced at trial. We agree with the state.

"[A] prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . It is not, however, improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 435, 902 A.2d 636 (2006). Moreover, "[a]lthough prosecutors generally should try to avoid using phrases that begin with the pronoun I, such as I think or I believe, we recognize that the use of the word I is part of our everyday parlance and . . . because of established speech patterns, it cannot always easily be eliminated completely from extemporaneous elocution." (Internal quotation marks omitted.) Id., 436.

As previously discussed, the defendant devoted a portion of his closing argument to arguing that the victims' allegations were implausible, uncorroborated by physical evidence, and a possible attempt to sabotage the defendant's relationship with the victims' mother. When

viewed in light of this theory, the prosecutor's comments—which largely comprised a series of declarative factual statements—constituted a proper attempt to rebut defense counsel's arguments by encouraging the jury to draw inferences that were favorable to the state's theory of the case and adverse to that of the defendant. For instance, the prosecutor supported his assertion that there was "no reason" to discredit the victims' allegations by reciting a number of facts, and encouraging a number of inferences that, considered as a whole, suggested the victims had little incentive to lie. See *State* v. *Stevenson*, 269 Conn. 563, 585, 849 A.2d 626 (2004) ("[i]t is not improper for a prosecutor to remark on the motives that a witness may have to lie, or not to lie, as the case may be" [internal quotation marks omitted]). Similarly, when the prosecutor characterized some of the defense witnesses' testimony as "useless" and "worthless," he was not placing his personal opinion before the jury, but, rather, drawing attention to the fact that, due to their inability to recall critical details about the defendant's whereabouts at the pool party, their testimony neither supported the defendant's theory of the case nor undercut that of the state. Under these circumstances, we conclude that the prosecutor's comments constituted proper, albeit blunt, commentary on the evidence presented at trial.

Furthermore, we conclude that the prosecutor's characterization of the defendant's explanation as "ridiculous," and his assertion that it "put the nail in [the defendant's] coffin," was, although forceful, a proper rhetorical device directed at highlighting the implausibility of the defendant's claim. See *State* v. *Stevenson*, supra, 269 Conn. 584 ("The [prosecutor]'s remark during closing argument describing the defendant's explanation as . . . 'totally unbelievable' did not necessarily express her personal opinion. Rather, it was a comment on the evidence presented at trial, and it posited a reasonable inference that the jury itself could have drawn without access to the [prosecutor]'s personal knowledge of the case."); *State* v. *Grant*, 154 Conn. App. 293, 321, 112 A.3d 175 (2014) ("[N]ot every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . [S]ome use of sarcastic and informal language, when intended to forcefully criticize a defense theory on the permissible bases of the evidence and the common sense of the jury, is not necessarily improper." [Citation omitted; internal quotation marks omitted.]), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015). Here, "[w]e must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The state's attorney should not be put in the rhetorical straitjacket of always using the passive

voice, or continually emphasizing that he [or she] is simply saying I submit to you that this is what the evidence shows, or the like." (Internal quotation marks omitted.) *State* v. *Ciullo*, supra, 314 Conn. 41. For these reasons, we do not agree that the prosecutor improperly expressed his personal opinion during rebuttal argument.

## C

### Improper Appeal to Emotions, Passions And Prejudices of Jury

Finally, the defendant claims that the prosecutor improperly appealed to the emotions, passions, and prejudices of the jury during the state's rebuttal argument. Specifically, the defendant argues that by referencing the emotional trauma experienced by the victims, the prosecutor improperly vouched for their credibility and simultaneously appealed to the jury's emotions, passions, and prejudices. The state contends that the prosecutor properly appealed to the jurors' common sense while rebutting the defendant's suggestion that the victims' allegations were not plausible. We agree with the state.

"[I]t is axiomatic that a prosecutor may not advance an argument that is intended solely to appeal to the jurors' emotions and to evoke sympathy for the victim or outrage at the defendant. . . . An appeal to emotions, passions, or prejudices improperly diverts the jury's attention away from the facts and makes it more difficult for it to decide the case on the evidence in the record. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors [that] are likely to skew that appraisal. . . . An improper appeal to the jurors' emotions can take the form of a personal attack on the defendant's character . . . or a plea for sympathy for the victim or her family." (Internal quotation marks omitted.) *State* v. *Maguire,* supra, 310 Conn. 554–55.

During his rebuttal argument, the prosecutor twice remarked that the victims had experienced emotional trauma resulting from their allegations against the defendant. Specifically, the prosecutor stated: "And with respect to these girls making this story up. Let's think about it this way. All right? Three years ago, their argument is, three years ago they made this story up so their mom wouldn't go out with this guy. Now, think about it. Think about how these girls, *the trauma these girls have gone through because of this*. For three years they're telling people this story. They have to come and tell me the story. They have to come and tell [the department] the story. They have to go to Saint Francis [Hospital and Medical Center] and tell the story. They have to tell their counselors the story. They have to

come and tell a bunch of strangers, you, in open court, this story. At any time they could have said, I made this up. But, no, for three years they tell the same story. And they know at this point, or they have to know at this point, that there's no way their mom is going out with this guy. Right? I mean, it's three years later. All these things had come out. They know that they can come and say it didn't happen, but they did. *And they went through the trauma.* And they went through the cross-examination. And they went through the tears. And they went through all this, and they still want you to believe, the defendant does, that this is made up because she was going to go out on a date with him three years ago. It just doesn't make any sense." (Emphasis added.)

We conclude that these comments constituted proper argument that the victims lacked an incentive to fabricate their allegations. Rather than appealing to the jurors' emotions, passions, and prejudices, the prosecutor was asking them to exercise their common sense and assess why the victims would lie about the defendant when doing so would require them to undergo the emotionally difficult process of repeatedly telling their story to one stranger after another. See *State* v. *Warholic*, 278 Conn. 354, 364–65, 897 A.2d 569 (2006) (prosecutor's comments that it was "stretch to think that [victim] is kind of . . . a mastermind behind making this up" and that "[t]he kid who was molested came in here and faced you all and said it" were proper arguments that victim had "no motive to lie" [internal quotation marks omitted]); *State* v. *Stevenson*, supra, 269 Conn. 585 ("[i]t is not improper for a prosecutor to remark on the motives that a witness may have to lie, or not to lie, as the case may be" [internal quotation marks omitted]. Moreover, this argument was directly responsive to defense counsel's suggestion that the victims' allegations were implausible. Accordingly, we conclude that the prosecutor's comments did not improperly appeal to the emotions, passions, and prejudices of the jury. Because we conclude that the prosecutor's statements in the present case were not improper, we need not consider whether any claimed impropriety deprived the defendant of his right to a fair trial. See *State* v. *Otto*, 305 Conn. 51, 76 n.19, 43 A.3d 629 (2012); *State* v. *Herring*, 151 Conn. App. 154, 173 n.11, 94 A.3d 688 (2014).

The judgment is affirmed.

In this opinion DiPENTIMA, C. J., concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

[2] "An MIT consists of mental health and law enforcement professionals, as well as [Department of Children and Families] employees, all of whom work collaboratively to investigate and treat cases of reported sexual abuse." *State* v. *Maguire*, supra, 310 Conn. 543; see also General Statutes § 17a-106a.

[3] Although the court determined that the videos fell within the two excep-

tions to the hearsay rule, it also determined that certain portions of the videos pertaining to uncharged misconduct were unfairly prejudicial and, therefore, inadmissible.

[4] The state argues that the defendant's claim that the court improperly admitted the interview summaries is briefed inadequately because he did not independently analyze their admissibility. We disagree. Although the defendant uses the videos as a focal point of his argument, it is evident that the crux of his claims on appeal is that the *statements* made by the victims to Murphy-Cipolla and Byrne constituted inadmissible hearsay, irrespective of whether they were introduced to the jury in videos or in reports generated by the advocacy center.

[5] Section 8-10 of the Connecticut Code of Evidence provides in relevant part: "Notwithstanding any other rule of evidence or provision of law, a statement by a child under thirteen years of age relating to a sexual offense committed against that child, or an offense involving physical abuse committed against that child by a person or persons who had authority or apparent authority over the child, shall be admissible in a criminal or juvenile proceeding if: (1) The court finds, in a hearing conducted outside the presence of the jury, if any, that the circumstances of the statement, including its timing and content, provide particularized guarantees of its trustworthiness, (2) *the statement was not made in preparation for a legal proceeding*, (3) the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement including the content of the statement, the approximate time, date and location of the statement, the person to whom the statement was made and the circumstances surrounding the statement that indicate its trustworthiness, at such time as to provide the adverse party with a fair opportunity to prepare to meet it, and (4) either (A) the child testifies and is subject to cross-examination at the proceeding, or (B) the child is unavailable as a witness and (i) there is independent nontestimonial corroborative evidence of the alleged act, and (ii) the statement was made prior to the defendant's arrest or institution of juvenile proceedings in connection with the act described in the statement. . . ." (Emphasis added.)

[6] Section 8-3 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness . . . (5) . . . A statement made for purposes of obtaining a medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to the medical diagnosis or treatment."

[7] This court would not ordinarily address whether the trial court properly admitted evidence pursuant to one exception of the hearsay rule when our review reveals, as it does in this case, that the court properly admitted the same evidence pursuant to another exception. See *State* v. *Giovanni P.*, 155 Conn. App. 322, 331–32 n.11, 110 A.3d 442, cert. denied, 316 Conn. 909, 111 A.3d 883 (2015). We do so here, however, because the defendant's claim raises the important question of whether the standard for admission of forensic interview evidence under the tender years exception to the hearsay rule is essentially coterminous with the standard for admission of the same evidence under the medical diagnosis and treatment exception.

[8] "Under *Crawford* v. *Washington*, supra, 541 U.S. [68–69], the hearsay statements of an unavailable witness that are testimonial in nature may be admitted under the sixth amendment's confrontation clause only if the defendant has had a prior opportunity to cross-examine the declarant. Hearsay statements that are nontestimonial in nature are not governed by the confrontation clause, and their admissibility is governed solely by the rules of evidence. . . . Thus, the threshold inquiry for purposes of the admissibility of such statements under the confrontation clause is whether they are testimonial in nature." (Internal quotation marks omitted.) *State* v. *Maguire*, supra, 310 Conn. 564 n.14.

[9] The court in *Arroyo* chose to dispose of the defendant's confrontation clause claim on the ground that the statements were not testimonial hearsay. *State* v. *Arroyo*, supra, 284 Conn. 621. The court could have chosen, however, to analyze the defendant's claim under the confrontation clause on the ground that because the victim testified at trial and was subject to cross-examination, there could be no sixth amendment violation even if the statement was testimonial. The court in *Arroyo* did not explain why it chose to dispose of the confrontation clause claim on the basis that it did rather than on some other ground.

[10] We note that subsequent to *Maguire*, the defendant's trial, and argument

and briefing in this appeal, the United States Supreme Court decided *Ohio v. Clark*,     U.S.     , 135 S. Ct. 2173, 2181, 192 L. Ed. 2d 306 (2015), in which it held that statements made by a three year old child to his school-teacher were not testimonial under *Crawford*. *Clark* is distinguishable from the present case in several respects. First, the statements in *Clark* "occurred in the context of an ongoing emergency involving suspected child abuse . . . [b]ecause the teachers needed to know whether it was safe to release [the victim] to his guardian at the end of the day . . . ." Id. In the present case, no similar ongoing emergency existed because the defendant was not the victims' guardian and their mother was therefore free to keep the victims separated from him.

Second, in *Clark*, "[t]he teachers asked [the victim] about his injuries immediately upon discovering them, in the informal setting of a preschool lunchroom and classroom, and they did so precisely as any concerned citizen would talk to a child who might be the victim of abuse." Id. Here, however, the victims were questioned after reporting their injuries to their mother, in the setting of a formal interview, which was conducted systematically by two professionals whose purpose was to elicit comprehensive information specifically related to the nature and extent of the alleged abuse. Accordingly, *Clark* does not undermine our conclusion that the statements in the present case are inadmissible under the tender years exception.

[11] We recognize that these questions may serve a dual purpose because eliciting these details may, in many instances, assist medical professionals in making a diagnosis and developing a treatment plan.

[12] Again, we emphasize that the discussion in *Arroyo* regarding whether the statements were testimonial was necessary only because the court was addressing a direct *Crawford* challenge.

[13] The concurrence asserts that the court in *Maguire* "recognized that, while §§ 8-3 and 8-10 of the Connecticut Code of Evidence relate to the admissibility of statements made, respectively, for medical purposes and statements on other issues by children of tender years, when they result from forensic interviews, they are 'similar' . . . ." We do not read *Maguire* in the same manner. Rather, as we have discussed, the court in *Maguire* stated that statements elicited during a forensic interview *that are admissible* under the tender years exception are similar to statements made to a physician while seeking medical treatment, which are *also admissible* under the medical treatment and diagnosis exception. See *State* v. *Maguire*, supra, 310 Conn. 569 ("statements made in the course of a forensic interview that satisfy the criteria for admission under the tender years exception are similar to statements made to a physician in the course of medical treatment, which are admissible under the medical treatment and diagnosis exception to the hearsay rule"). Thus, the court's comparison pertained only to statements deemed admissible under both exceptions. We do not read this language to mean that a statement inadmissible under the tender years exception will always be inadmissible under the hearsay exception for statements made for medical treatment.

The concurrence asserts that "[o]ur Supreme Court has addressed both [§§ 8-3 and 8-10 of the Connecticut Code of Evidence] in *Maguire* and, by inference, has given us the 'primary purpose' guide for the medical treatment exception." As discussed in the preceding paragraph, the court in *Maguire* did not consider whether the statements challenged in that case were admissible under the medical treatment and diagnosis exception to the hearsay rule, but only whether they were admissible under the tender years exception. Thus, contrary to the concurrence's assertion, *Maguire* does not suggest that the primary purpose inquiry governs the admissibility of forensic interview statements under the medical diagnosis and treatment exception.

Finally, we note that although the challenged statements in *Arroyo* were offered under the medical diagnosis and treatment exception; see *State* v. *Arroyo*, supra, 284 Conn. 625; and the court therein engaged in a primary purpose analysis to determine whether their admission was barred by the sixth amendment; id., 626–36; the primary purpose analysis would have been entirely unnecessary in the absence of a *Crawford* challenge. The court engaged in the primary purpose analysis in *Arroyo* only because the defendant in *Arroyo* raised a direct confrontation clause claim under the sixth amendment. Id., 625. In fact, the court in *Arroyo* determined, apart from its primary purpose analysis, that the trial court properly admitted the victim's statements pursuant to the medical diagnosis and treatment exception to the hearsay rule. See id., 635 n.23. In doing so, it concluded, inter alia, that the challenged statements were made "in furtherance of obtaining medical treatment . . . ." Id. This separate analysis apart from the primary purpose inquiry further suggests that the court did not consider the primary purpose test to govern the admissibility of statements under the medical diagnosis and treatment exception.

[14] The concurrence in footnote 2 cites to two portions of C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 8.4.2, p. 465, in support of its conclusion that the statements were inadmissible under the hearsay exception for statements made for purposes of obtaining medical diagnosis or treatment. Neither of these references supports its conclusion that the statement should not have been admitted under that exception.

First, the concurrence quotes a portion of the treatise that discusses the theoretical bases for hearsay exceptions in general, which bases include "some consideration of necessity." Id. The concurrence states that "defense counsel's objection on the [ground of] lack of any necessity was persuasive because both children had already testified under oath." Necessity, however, is an express requirement that a proponent must meet only for the residual exception to the hearsay rule. See Conn. Code Evid. § 8-9. With respect to the hearsay exception for statements made for purposes of obtaining medical diagnosis or treatment, necessity is not an important consideration because the exception exists even if the declarant, as in this case, is available as a witness. See C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 8.4.2, pp. 510–11. Indeed, § 8-3 of the Connecticut Code of Evidence explicitly provides: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness . . . (5) Statement for purposes of obtaining medical diagnosis or treatment." Instead, such statements are admitted under the exception in the absence of necessity and even if the declarant testifies, because such statements are made "under circumstances in which there is a motive to tell the truth, or at least a motive to lie is unlikely." C. Tait & E. Prescott, supra, § 8.4.2 (b) (3), p. 512.

Second, the concurrence also cites to the treatise's concern that statements made to law enforcement or investigative agencies should be "carefully reviewed" because they "may be less than voluntary or may be motivated by the incentive to generate evidence." C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 6.37.5, p. 391. As the concurrence concedes, however, these concerns are contained in the treatise's analysis of the constancy of accusation rule, and the statements in this case were not offered under that rule. In sexual assault cases, however, statements made by adult victims to health care providers for necessary medical diagnosis and treatment following a sexual assault are routinely admitted for substantive purposes under § 8-3 (5) of the Connecticut Code of Evidence. In this case, the issue we must decide is whether the children's statements during the interviews were reasonably pertinent to obtaining medical diagnosis or treatment. Under that standard, which we determined differs from and is more relaxed than the tender years exception, we must conclude that the court did not abuse its discretion in admitting the statements.

[15] Although the prosecutor's comments were not improper in the context of this case, we encourage counsel who believe that opposing counsel has presented argument not permitted by the Code of Evidence to seek an instruction from the court directing the jury to disregard the improper argument.

[16] The defendant also claims that the prosecutor improperly expressed the opinion that the defendant was "abnormal." As previously discussed, we have concluded that the comments underlying this claim were a proper response to arguments made by defense counsel at closing argument. See part II A of this opinion. For this reason, we do not address them again here.